UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER H. PATTERSON,<br><br>Petitioner,<br><br>v.<br><br>DAVE DAVEY, Warden,<br><br>Respondent. | No. 1:17-cv-00827-DAD-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently serving a sentence of life without possibility of parole for his conviction of first degree murder during commission of a robbery and participating in a criminal street gang. He filed the instant habeas action challenging the conviction and sentence. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

**I.     PROCEDURAL HISTORY**

On October 16, 2013, Petitioner was found guilty in the Kern County Superior Court of: first degree murder during commission of a robbery (Cal. Penal Code §§ 187(a), 189, 190.2(a)(17)); robbery with the personal infliction of great bodily injury (Cal. Penal Code §§ 212.5(c), 12022.7(a)); and active participation in a criminal street gang (Cal. Penal Code § 186.22(a)). People v. Patterson, 2015 WL 3563502, at *1 (Cal.Ct.App. 2015). In a bifurcated court trial, it was determined that Petitioner had served a prior prison term (Cal. Penal Code §

1

667.5(b)). Id. Petitioner was sentenced to an indeterminate term of life without the possibility of parole plus four years. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). The Fifth DCA modified the sentence, staying the sentence imposed on count three; however, the judgment was affirmed in all other respects on June 9, 2015. Id. Petitioner then filed a petition for review in the California Supreme Court. (LD 4.[1]) The petition was summarily denied on August 12, 2015. (LD 5.)

Petitioner filed at least nine petitions for collateral relief in the state superior court. Many of the petitions were filed during trial or prior to the conclusion of the direct appeal. Petitioner filed four post-conviction petitions in the superior court relative to the claims in this petition, as follows: 1) Petition filed January 23, 2015, and denied on August 14, 2015; 2) Petition filed on February 5, 2015, and denied on April 28, 2015; 3) Petition filed on June 23, 2016, and denied on September 7, 2016; and 4) Petition filed on January 6, 2017, and denied on February 28, 2017. (LD 6-13.)

Petitioner filed four petitions for writ of habeas corpus in the California Court of Appeal, as follows: 1) Petition filed July 21, 2015, and denied on October 1, 2015; 2) Petition filed on September 23, 2015, and denied on September 30, 2015; 3) Petition filed on October 12, 2016, and denied on December 8, 2016; and 4) Petition filed on April 5, 2017, and denied on May 26, 2017. (LD 14-21.) Petitioner also filed two petitions for writ of habeas corpus in the California Supreme Court: 1) Petition filed February 29, 2016, and denied on May 18, 2016; and 2) Petition filed on February 23, 2017, and denied on April 12, 2017. (LD 22-25.)

On June 21, 2017, Petitioner filed a federal petition for writ of habeas corpus in this Court. (Doc. 1.) He filed a First Amended Petition on August 14, 2017. (Doc. 9.) Respondent filed an answer to the First Amended Petition on January 25, 2018. (Doc. 23.) Petitioner filed a traverse on April 23, 2018. (Doc. 30.)

///

///

---

[1] "LD" refers to the documents lodged by Respondent with the answer.

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

> The facts of the crimes are largely irrelevant to the issues before us. Briefly stated, on August 19, 2012, defendant, a member of the Eastside Crips criminal street gang, was seated on a planter just outside a grocery store when 71–year–old Guadalupe Ramos walked from the store to her daughter's car a short distance away in the parking lot. Defendant grabbed Ramos from behind and pulled a gold chain from around her neck knocking her to the pavement in the process and causing her to hit her back and head. Defendant then ran out of the parking lot and was picked up in a vehicle by fellow gang members McDonald and Slaughter. The vehicle, which had been in the grocery store parking lot for several minutes before Ramos was accosted, then sped off.
>
> Ramos was taken to the hospital. She was pronounced dead a short time later. The forensic pathologist who performed the autopsy stated the cause of death as "emotion stress by precipitated sudden cardiac death due to marked excitation and emotional stress associated with physical exertion during robbery confrontation," and "cardiac dysrhythmia or irregular heartbeat associated with blunt force trauma to the trunk and the extremity."

Patterson, 2015 WL 3563502, at *1 (Cal.Ct.App. 2015).

## III. DISCUSSION

### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA

---

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539

U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

### C. Review of Claims

The petition presents the following three grounds for relief: 1) Trial court committed reversible error when it denied the defense motion to change venue based on the sensational pretrial publicity; 2) Defense counsel rendered ineffective assistance of counsel in several aspects; and 3) Petitioner's sentence constitutes cruel and unusual punishment under the Eighth Amendment.

#### 1. Motion to Change Venue

Petitioner claims the trial court violated his constitutional right to an impartial jury when it denied the defense motion for change of venue. He claims there was a substantial amount of sensational pretrial publicity concerning the crime which created a hostile environment in the community where the crime was committed and the trial was being held. He alleges he did not receive a fair trial.

Petitioner raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

Defendant unsuccessfully sought to change trial venue out of Kern County. He says the trial court erred by denying his motion. We disagree.

*A. Background and Procedural History*

Defendant was tried after McDonald and Slaughter had already been convicted. He moved, in limine, for a change of venue. In support, he submitted six different articles published in the local newspaper, on that newspaper's Internet site, and on a local television station's Internet site. [FN3.] The first, dated September 5, 2012, recounted the arrest of the three suspects, gave their names and ages and a brief recap of the crime and Ramos's cause of death, and referred to defendant as an "AB 109 Probationer." The article named Patterson as the suspect who took Ramos's necklace, and explained that AB 109 allows nonviolent, nonserious, and nonsex offenders to serve their sentences in county jails instead of state prisons. The second (not dated) recounted Slaughter's conviction, and included a brief recap of the crime, that McDonald was convicted on April 8, and that Patterson was scheduled for a readiness hearing. The third article, dated May 14, 2013, reported on Slaughter's sentencing, and quoted Ramos's daughter as saying of the other defendants, " 'One down, two to go.' " The article stated Slaughter's attorney believed defendant might be willing to testify Slaughter had nothing to do with the robbery. The fourth article, dated June 14, 2013, recounted McDonald's April 2013 conviction and continuance of sentencing, and contained a brief recap of the crime, including defendant's and Slaughter's names. The fifth article (not dated) recounted another continuance in McDonald's sentencing and again contained a brief recap of the crime. The final and most recent article, dated September 18, 2013, recounted McDonald's sentencing and contained essentially the same recap of the crime as was contained in the prior articles.

> [FN3.] Defendant actually submitted eight articles, but in two instances, the same article was published both in the local newspaper and on that newspaper's Internet site.

Defendant's motion was heard October 2, 2013. The court decided it would examine individually those prospective jurors who claimed hardship and/or had knowledge of the case. It asked the attorneys to prepare a short statement of the case sufficient to trigger recollection in someone with such knowledge, and to include mention of the taking of a necklace, since that was a common theme in the articles. The court then denied the motion without prejudice, subject to it being renewed after completion of individual voir dire.

Jury selection began that same afternoon, with an initial panel of 80 prospective jurors being summoned. Ultimately, a second panel of prospective jurors was also examined. Pursuant to the factual statement prepared by counsel, the court told each panel:

> "This is a homicide case where the defendant is accused of one count of first degree homicide with special circumstances alleged. The name of the decedent is Guadalupe Ramos. The homicide occurred on August 19, 2012, at Foods Co. located at 2505 Haley Street in east Bakersfield. Guadalupe Ramos had her necklace taken in the parking lot of Foods Co. She later died at Kern Medical Center."

As to each panel, the court temporarily excused those prospective jurors who did not believe they had a hardship or prior knowledge of the case, but required all others to remain. Those who claimed hardship or knowledge were then

individually examined outside the presence of other prospective jurors.

According to the trial court's count, 78 prospective jurors remained at the conclusion of individual voir dire. Defendant renewed his motion for a change of venue, arguing that more than 30 of the remaining prospective jurors had some knowledge of events. [FN4.] He acknowledged, however, that when examined by the court, all said they could set aside their prior knowledge of the case. The prosecutor observed that very few had extensive knowledge, and he argued all could be fair.

> [FN4.] By our count, 36 said they had prior knowledge of the case but could set it aside and decide the case based solely on the evidence presented in court. An additional 15 were excused because of doubts they could set aside what they knew.

The court stated it was satisfied all the remaining prospective jurors who had some knowledge of the case were honest when they said they could set that knowledge aside, and they understood their duty to decide the case based solely on the evidence presented in the courtroom. It observed that most had very limited knowledge, and that most who had more than minimal knowledge were excused, particularly if they had formed strong opinions. Based on the number of prospective jurors still available to try the case, and taking into account the factors to be considered with regard to a change of venue, the court found no reasonable likelihood defendant would be unable to receive a fair and impartial trial in Kern County. Accordingly, it denied the renewed motion, but gave defendant leave to raise the issue at the conclusion of jury selection if necessary.

Defendant did not challenge for cause any of the remaining prospective jurors who had knowledge of the case. He did, however, use 18 of his 20 peremptory challenges to remove such individuals. Before exercising his 20th and final peremptory challenge, defendant moved at sidebar for additional challenges for the same reasons he asked for a change of venue. He also renewed his change of venue motion based on the fact some 36 or 37 prospective jurors remained who had knowledge of the case. The court denied both motions.

With respect to the three alternate jurors, defendant exercised two peremptory challenges against prospective jurors with knowledge of the case. The defense announced its acceptance of the alternates despite the fact Juror No. 2909379, who had knowledge of the case from what he or she had seen on television and read in the paper several months or more before trial, remained.

The trial and alternate jurors were sworn on October 7, 2013. Juror No. 2909379 was seated as a trial juror on October 15, 2013, after another trial juror was excused for cause. Juror No. 2909379 was the only one of the trial jurors with knowledge of the case.

*B. Analysis*

"'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.'" (*People v. Panah* (2005) 35 Cal.4th 395, 447; § 1033, subd. (a).) "'[R]easonable likelihood'" means something less than "'more probable than not,'" but something more than "merely 'possible.'" (*People v. Bonin* (1988) 46 Cal.3d 659, 673, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Each case is resolved on its own facts, and the moving party bears the burden of proof. (*People*

7

*v. Sanders* (1995) 11 Cal.4th 475, 505.)

"In contrast to pretrial appellate review by way of a petition for a writ of mandate, review on appeal is retrospective. Thus, 'any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial.' [Citation.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 360.) "On appeal, '"the defendant must show both that the [trial] court erred in denying the change of venue motion, i.e., that at the time of the motion it was reasonably likely that a fair trial could not be had, and that the error was prejudicial, i.e., that it [is] reasonably likely that a fair trial was not *in fact* had."' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 943.)

"'On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county....' [Citation.] 'Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: "(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." ' [Citation.]" (*People v. Suff* (2014) 58 Cal.4th 1013, 1044–1045.)

With regard to the first factor, "[t]he peculiar facts or aspects of a crime which make it sensational, or otherwise bring it to the consciousness of the community, define its 'nature'; the term 'gravity' of a crime refers to its seriousness in the law and to the possible consequences to an accused in the event of a guilty verdict." (*Martinez v. Superior Court* (1981) 29 Cal.3d 574, 582.) Special-circumstance murder is an offense of "utmost gravity," even when the death penalty is not sought. (*Williams v. Superior Court* (1983) 34 Cal.3d 584, 593.) The murder in the commission of a robbery involved here is an extremely serious offense; thus, this factor favors, but does not compel, a change of venue. (See *People v. Davis* (2009) 46 Cal.4th 539, 578; *People v. Weaver* (2001) 26 Cal.4th 876, 905.) Although the somewhat unusual circumstances of the offense impact the nature of the case, these are matters that "will not change with a change of venue." (*People v. Edwards* (1991) 54 Cal.3d 787, 808.) "'Prospective jurors would sympathize with [Ramos's] fate' no matter where the trial was held, and this sympathy stems from the nature of the crime, 'not the locale of trial.' [Citation.]" (*People v. Davis, supra*, 46 Cal.4th at p. 578.)

The second factor—the nature and extent of the news coverage—weighs against a change of venue. Defendant submitted little in the way of media coverage; all was relatively brief, factual, and not sensational. (See *People v. Suff, supra*, 58 Cal.4th at p. 1048; *People v. Adcox* (1988) 47 Cal.3d 207, 232.) Although the most recent article appeared only a couple of weeks before defendant's trial and recounted the sentencing of an alleged coperpetrator, defendant fails to convince us the trial court's individual voir dire of those prospective jurors with knowledge of the case was insufficient to significantly reduce any potential prejudice. [FN5.] (See *People v. Suff, supra*, 58 Cal.4th at p. 1049.)

> [FN5.] For instance, defendant points to one prospective juror's statement that "[i]t's been all over the television news, social media, newspaper. It's a pretty well publicized case. And unless you are living under a rock, I mean, you have heard about it." However, this prospective juror described

8

himself as "an avid news watcher," who "like[s] to know what's going on." Yet even he said he had not heard anything about a trial involving persons other than defendant who allegedly were involved in the case. Moreover, this prospective juror was excused for cause. Even those prospective jurors who, according to defendant, alluded to the number and prominence of news reports on the subject all clarified those reports appeared nearer to when the crime happened, and that they could not recall hearing or seeing anything about the case within the last several months.

Defendant calculates that nearly half the prospective jurors available for group voir dire had knowledge of the case. Even if we were to interpret this fact as suggesting the pretrial publicity was considerably more extensive than shown by the evidence defendant presented to the trial court, however, "[p]ervasive publicity alone does not establish prejudice. [Citation.]" (*People v. Prince* (2007) 40 Cal.4th 1179, 1214.) "'"It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."' [Citations.]" (*People v. Panah, supra*, 35 Cal.4th at p. 448.) "The relevant question is not whether the community remembered the case, but whether the jurors at [defendant]'s trial had such fixed opinions that they could not judge impartially the guilt of the defendant. [Citation.] It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." (*Patton v. Yount* (1984) 467 U.S. 1025, 1035.) "[J]uror *impartiality* ... does not require *ignorance*. [Citations.]" (*Skilling v. United States* (2010) 561 U.S. 358, 381.) The California Supreme Court has upheld denial of venue changes in cases involving considerably greater recognition and formation of opinion. (See, e.g., *People v. Harris* (2013) 57 Cal.4th 804, 825–826 [72 percent of participants in defendant's telephonic survey recognized case; of those, 55 percent said defendant was definitely or probably guilty of murder and 45 percent said he should receive death penalty]; *People v. Rountree* (2013) 56 Cal.4th 823, 838–839 ["high" percentage of community had heard of case and "many" had formed opinion regarding defendant's guilt]; but see *People v. Williams* (1989) 48 Cal.3d 1112, 1128–1130 [venue should have been changed where 52 percent of prospective jurors had read or heard of case; eight of 12 jurors ultimately seated had read or heard of case; and substantial percentage of venire knew victim, victim's family, or people in district attorney's office].)

Insofar as the record before us shows, many of the prospective jurors had little or no knowledge beyond the basic facts of the case that were reported early on, and stated they either had formed no opinion as to guilt or had not formed a fixed opinion, and could base a verdict solely on the evidence presented at trial. (See *People v. Alfaro* (2007) 41 Cal.4th 1277, 1323.) In fact, none of the original trial jurors professed to have knowledge of the case, and the alternate juror who had some knowledge and who became a trial juror partway through trial could only recall that a lady was robbed of a necklace and knocked down. He had no doubt about his ability to set aside what he had heard and decide the case based solely on the evidence presented in the courtroom. The trial court found credible his statements, as well as those of the other prospective jurors who remained after individual voir dire, and excused those who had prejudged defendant's guilt or did not appear able to return a verdict based solely on the trial evidence. We will not substitute our evaluation of credibility for the trial court's determination in that regard. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1146; *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

It is true "the fact that the jurors declared they could decide the case impartially on the evidence does not preclude the necessity of a change of venue." (*People v.*

*Daniels* (1991) 52 Cal.3d 815, 853; see *People v. Cooper* (1991) 53 Cal.3d 771, 807 [juror declarations of impartiality not conclusive].) "'In exceptional cases, "'adverse pretrial publicity can create such a *presumption* of prejudice in a community that the jurors' claims that they can be impartial should not be believed,' [citation]...." [Citation.] "The category of cases where prejudice has been presumed in the face of juror attestation to the contrary is extremely narrow. Indeed, the few cases in which the [United States Supreme] Court has presumed prejudice can only be termed extraordinary, [citation], and it is well-settled that pretrial publicity itself—'even pervasive, adverse publicity—does not inevitably lead to an unfair trial' [citation]." [Citation.] This prejudice is presumed only in *extraordinary* cases—not in every case in which pervasive publicity has reached most members of the venire.' [Citation.]" (*People v. Farley* (2009) 46 Cal.4th 1053, 1086.)

"The present case does not fall 'within the limited class of cases in which prejudice would be presumed under the United States Constitution.' [Citation.]" (*People v. Farley, supra*, 46 Cal.4th at p. 1087; see *Beck v. Washington* (1962) 369 U.S. 541, 557.) Although jurors' assurances of impartiality are not dispositive, we are not free to ignore them. (*People v. Rountree, supra*, 56 Cal.4th at p. 841.) The record presents no reason to doubt the actual jurors' and alternates' assertions they could be fair. (See *People v. Cooper, supra*, 53 Cal.3d at p. 807.) [FN6.]

> [FN6.] Defendant argues the "intense" publicity "could" have affected those claiming to have no knowledge of the case, because once they were in trial hearing evidence, such jurors were "likely" to remember they had in fact previously heard news reports on the subject, and their family and acquaintances were "likely" to influence jurors' ability to remain impartial. These assertions are sheer speculation, and the notion publicity was "intense" is not borne out by the record. Nothing about this case "'suggests a community with sentiment so poisoned against [defendant] as to impeach the indifference of jurors who displayed no animus of their own.' [Citation.]" (*People v. Farley, supra*, 46 Cal.4th at p. 1085.)

The third factor to be considered is the size of the community. "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness. [Citation.]" (*People v. Balderas* (1985) 41 Cal.3d 144, 178.) Conversely, "'[t]he smaller the community, the greater the likelihood the accused will not get a fair trial in a case of this nature.' [Citations.]" (*People v. Adcox, supra*, 47 Cal.3d at p. 233.)

This factor does not support a change of venue. Although the record does not reflect the population of Kern County at the time of trial, the California Supreme Court has long found this factor to be neutral, or even tilting against a change of venue, where Kern County is concerned. (See, e.g., *People v. Harris, supra*, 57 Cal.4th at p. 828 [population of 648,400 in 1999]; *People v. Rountree, supra*, 56 Cal.4th at p. 839 [population of 543,477 as of 1990 census]; *People v. Weaver* (2001) 26 Cal.4th 876, 898, 905 [population exceeding 450,000 at time of 1984 trial]; *People v. Murtishaw* (1989) 48 Cal.3d 1001, 1015 [population of 405,600 in 1981].)

Turning to the final factors—the status of the defendant, and the prominence and popularity of the victim—we conclude they are neutral or weigh against a change of venue. Neither defendant nor Ramos was an outsider to the community (see *People v. Daniels, supra*, 52 Cal.3d at p. 852), and while it is apparent Ramos was loved by those who knew her, she was not a prominent person. (See *People v.*

10

*Rountree, supra*, 56 Cal.4th at p. 839.) Any posthumous prominence she achieved through news accounts, or perceived prominence her daughter achieved through media appearances, did not favor a change of venue; in light of the fact Ramos led a relatively quiet life, "the community was not likely to have experienced a uniquely heightened sense of loss or anger which would presumably be alleviated by trial in another county. Any sympathetic features of the case would be apparent wherever it was tried." (*People v. Webb* (1993) 6 Cal.4th 494, 514–515; see *People v. Adcox, supra*, 47 Cal.3d at pp. 233–234.) Likewise, any unsympathetic features of the case—for example, defendant's gang affiliation and criminal record (status as an "AB 109 Probationer")—would also be apparent wherever the case was tried. (See *People v. Harris, supra*, 57 Cal.4th at pp. 828–829.)

Considering the foregoing factors as a whole (*People v. Gallego* (1990) 52 Cal.3d 115, 167), "[o]ur independent evaluation of the record leads us to conclude that defendant failed to demonstrate that it was reasonably likely that (1) he could not receive a fair trial in the absence of a change of venue, or (2) he did not in fact receive a fair trial. Therefore, denial of defendant's motion for change of venue did not deprive him of due process of law or a fair trial." (*People v. Suff, supra*, 58 Cal.4th at p. 1050.)

Patterson, 2015 WL 3563502, at *1–6.

### a. Legal Standard and Analysis

Defendants enjoy the right to due process to be tried by "a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 723 (1961). The Ninth Circuit has held that a habeas petitioner who alleges that the jury's exposure to prejudicial pretrial publicity prevented him from receiving a fair trial has the burden to produce pertinent portions of the state court record. Austad v. Risley, 761 F.2d 1348, 1353 (9th Cir.1985) (en banc). The determination of a juror's partiality or bias is a factual determination to which 28 U.S.C. § 2254(d)'s presumption of correctness applies, id. at 1350, and it is petitioner's duty under § 2254(d) to establish by convincing evidence that the challenged factual determinations of the state court were erroneous. Id. at 1353. If prejudicial pretrial publicity makes it impossible to seat an impartial jury, then the trial judge must grant the defendant's motion for change of venue. Harris v. Pulley, 885 F.2d 1354, 1361 (9th Cir. 1988). The prejudice requirement can be satisfied by a finding of: 1) presumed prejudice; or 2) actual prejudice.

#### i. Presumed Prejudice

"Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." Id. Courts rarely find presumed prejudice because "saturation" defines conditions found only in

extreme situations. Id.

In Rideau v. Louisiana, 373 U.S. 723 (1963), the Supreme Court found that the denial of a motion for change of venue violated due process when a confession made by the defendant was videotaped and broadcast three times by a local television station. Because three members of the jury who ultimately convicted the defendant had viewed the tape, the Court found the media publicity to be sufficiently extreme to invoke the presumed prejudice rule. Id. Unless the publicity renders the trial a "hollow formality," id. at 726, however, the presumed prejudice rule is rarely applicable. See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554 (1976).

In this case, it is clear prejudice cannot be presumed. The trial court reasonably determined that the article was merely routine coverage of a case that occurs with most every case at the start of trial. The appellate court noted that news coverage of the crime was sparse, relatively brief, factual and not sensational. Many of the prospective jurors had little or no knowledge of the crime. Petitioner submits nothing, nor is there anything in the record, from which to conclude that Petitioner's pretrial publicity rendered his trial a "hollow formality."

ii. Actual Prejudice

Actual prejudice exists if the jurors demonstrated actual partiality or hostility that cannot be laid aside. Harris, 885 F.2d at 1363. "Jurors need not, however, be totally ignorant of the facts and issues involved." Murphy v. Florida, 421 U.S. 794, 800 (1975).

Actual prejudice is not demonstrated by merely showing juror exposure to pretrial publicity. "The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035 (1984). The Supreme Court has held that a key factor in gauging the reliability of juror assurances of impartiality is the percentage of the venire who "will admit to disqualifying prejudice." Murphy, 421 U.S. at 803. The higher percentage of the venire admitting to a previously formed opinion on the case, the greater the concern over the reliability of the voir dire responses from the remaining potential jurors. Id.

In this case, Petitioner offers nothing to show that any juror was biased or prejudiced against him as a result of the news article. As noted by the state court, none of the original trial

12

jurors professed to have any knowledge of the case, and the alternate juror who became a trial juror partway through the case had only minimal knowledge of the case. Moreover, whether the jurors heard or read about the case prior to trial is immaterial, since all jurors swore under oath that they could impartially judge petitioner's guilt or innocence. Mu'Min v. Virginia, 500 U.S. 415 (1991) (finding no violation of due process where 8 of 12 sworn jurors stated they had knowledge of the case, but stated their contact with pretrial publicity would not affect their duties as jurors); Jeffries v. Blodgett, 5 F.3d 1180, 1189 (9th Cir.1993). It is Petitioner's duty under § 2254(d) to establish by convincing evidence that the challenged factual determinations of the state court were erroneous. Austad, 761 F.2d at 1353. He fails to do so. Since Petitioner fails to demonstrate actual prejudice caused by the pretrial publicity, Petitioner's claim fails.

2. Ineffective Assistance of Counsel

Petitioner next alleges defense counsel was ineffective. He contends defense counsel failed to request jury instructions on lesser included offenses. He further claims defense counsel failed to procure an expert in cardiology to assist the defense in establishing the cause of death of the victim. Petitioner presented his claims to the state superior court on collateral review.

a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

13

errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state court determination was erroneous, but also that it was objectively unreasonable. Yarborough v. Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

b. Lesser Included Offense Instructions

Petitioner contends that defense counsel rendered ineffective assistance by failing to request jury instructions on lesser included offenses. He argues that based on the trial evidence, it could have been argued that Petitioner applied no force during the robbery causing the victim's fall. He contends that the evidence could have showed that the victim fell of her own accord rather than being pushed or thrown to the ground.

The claim is meritless. The question of whether Petitioner forcibly dragged or threw the victim to the ground or the victim fell on her own accord is inconsequential. As Respondent correctly notes, under California law, the simple act of ripping a necklace from an already fallen victim is sufficient force for robbery. "The degree of force used is immaterial. All the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the

14

victim's resistance . . . ." People v. Clayton, 89 Cal.App. 405, 411 (1928). "Where property is snatched from the person of another . . . the crime amounts to robbery." People v. Lescallett, 123 Cal.App.3d 487, 491 (1981). Thus, regardless of whether Petitioner forced the victim to the ground or she fell on her own, there was sufficient evidence of force for robbery. A fair-minded jurist could agree that it was reasonable to forego a request for instructions on lesser included offenses. This is especially so since three eyewitnesses testified having watched Petitioner forcibly drag the victim down to the ground. The claim should be denied.

      c. Medical Expert

Petitioner next argues that defense counsel failed to call a medical expert concerning the victim's cause of death. He asserts that counsel did not consult or retain an expert, that such an expert would have provided favorable evidence for the defense, and that the expert's testimony would have changed the outcome of the trial.

The claim is completely speculative. Petitioner provides no support for his contentions. First, Petitioner fails to demonstrate that counsel did not in fact consult an expert. A medical expert testified at trial as to the cause of the victim's death and the testimony was not favorable to the defense. Counsel may have consulted with an expert who came to the same conclusion. Second, Petitioner provides no support for his contention that an expert would have provided favorable evidence. He merely speculates that some expert might have come to a defense-friendly conclusion. Third, Petitioner offers no factual support for his allegation that a defense expert's conclusion, that could have been defense-friendly, would have altered the outcome of the trial in light of the prosecution's own expert's testimony. The claim is conclusory and should be rejected.

    3. Unconstitutional Sentence

In his last claim, Petitioner contends that his sentence to life without the possibility of parole was cruel and unusual punishment under the Eighth Amendment. He alleges that he was a juvenile offender and could not be sentenced to life without the possibility of parole. He cites Miller v. Alabama, 567 U.S. 460 (2012) in support of his contentions. This claim was also presented in state petitions for writ of habeas corpus. In the last reasoned decision, the Kern

County Superior Court rejected the claim because Petitioner was not a juvenile at the time he committed the robbery-murder. He was born on January 4, 1993. (Supp. CT at 85.) He committed the robbery-murder on August 19, 2012. (LD 1.) Thus, on the date he committed the crime, he was 19 years, seven and one-half months old. In <u>Miller v. Alabama</u>, the Supreme Court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments. 567 U.S. at 465. Petitioner fails to cite any authority for his argument that <u>Miller</u> must be extended to a 19-year-old. Thus, the claim is without merit.

Petitioner argues that Cal. Penal Code § 190.5 extended <u>Miller</u> to 19-year-olds. The Kern County Superior Court found that § 190.5 was inapplicable. The state court's interpretation of state law is binding on this Court. See <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005). The claim should be denied.

## IV.  RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days (plus three days if served by mail) after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///
///
///
///

16

The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

    Dated:   **May 1, 2018**                            **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE